**CHECIE v CLEVELAND (city) et**

Ohio Appeals, 8th Dist, Cuyahoga Co.

No. 17429. Decided Nov. 20, 1939.

H. W. Speeth, Cleveland and Geo. B. Harris, Cleveland, for defendants-appellants.

Henry H. Brainard, Director of Law, Cleveland; Edward Blythin, Asst. Director of Law, Cleveland.

**2**

## OPINION

By MORGAN, J.

This is an action begun in the Common Pleas Court on March 31, 1939, in which the plaintiff, as a taxpayer, asks that a contract between the City of Cleveland and M. H. Rhodes Inc., defendants herein, for delivering and installing three thousand manual parking meters on a rental arrangement with an option to purchase by the City, be declared void and for an injunction restraining the parties from proceeding with the contract.

Plaintiff bases his action on allegations that the law of Ohio and the City Ordinances as to competitive bidding were not complied with; that the samples accompanying the bid of M. H. Rhodes Inc., were never tested, and that those which were tested failed to meet the tests in important particulars, and that both the original and substituted samples deviated materially from the specifications; also that the defendants were guilty of conspiracy and of fraud.

On June 20, 1938, the City Council of Cleveland passed an ordinance authorizing the Director of Public Safety to advertise for bids for three thousand (3000) parking meters of the manual type. This ordinance was amended on September 21, 1938, by authorizing competitive bids for both the manually operated and the automatic parking meters, reserving the right to the Board of Control, after the receipt of the bids, to decide what kind would be best adapted to the requirements of the city.

The City Charter of Cleveland required that advertising for competitive bids should be published once a week for two (2) consecutive weeks, in the City Record. In this case, there were four (4) weekly insertions of the advertisement for bids in the City Record the first insertion being on September 28, 1938, and the last on October 19th, 1938. Detailed specifications were prepared by the City which were modified on October 8th and on October 15th, 1938.

The bids were opened on October 27, 1938, and disclosed that six (6) bids were received for furnishing manual and four for furnishing automatic meters. The low bidder was the defendant, M. H. Rhodes Inc., on both the manual and the automatic type meters, whose bid was $19.95 for each manual meter and $33.60 for each automatic meter, to be furnished by the company and which are known in the trade as the "Mark Time" meter. The next lowest bid on the manual type meter was that of the United States Parking Meter Company at the price of $29.75 per meter, and the next lowest bid on the automatic meter was that of the Dual Parking Meter Company at $43.30 per meter.

The specifications prepared by the City required that each bidder "must submit with his proposal and as a part thereof, three (3) parking meters of the exact kind he proposes to furnish." The various bidders, including the defendant, M. H. Rhodes Inc., accompanied their bids with samples, the defendant submitting three (3) manual and three (3) automatic sample meters or six (6) samples in all.

The specifications further provided that the city would submit the samples furnished to a laboratory test, and that the test should first be made on the meters submitted by the lowest bidder conforming to the specifications.

The city selected The Pittsburg Testing Laboratory to make the tests and mailed by parcel post the six (6) sample meters submitted by the defendant, M. H. Rhodes Inc., to the laboratory at Pittsburg.

The sample meters were packed and shipped to Pittsburg by an employee of the city in charge of the store room at the City Hall. He packed the sample meters in two packages, one of

which contained two automatic meters and the other package contained one automatic meter and the three manual meters. He testified that the packages were carefully packed and mailed by parcel post to the laboratory.

The laboratory reported that the two automatic meters were damaged in shipment and that "as far as we could note from visual examination, all of the other four meters seemed unaffected."

It is a reasonable conclusion that the two automatic meters damaged were in one of the packages while no damage was observed to the three manual meters, and one automatic meter in the other package.

Nevertheless, the laboratory recommended that all new samples be substituted. As a result, Mr. Strasser, representing the defendant, M. H. Rhodes Inc., delivered in person six (6) samples, three manual and three automatic meters to the Pittsburg Testing Laboratory and these meters, and not the original meters were tested.

The laboratory submitted its report to the City on December 22, 1938. The report found that:

"The automatic meter as submitted did not meet the requirements of the specifications."

As to the manual type meter, the report concluded:

"The manual meter, while deviating from the specifications in several respects, meets our interpretation of the intent of the specifications in all essential characteristics."

This statement is somewhat ambiguous, as it cannot be contended that a meter which deviates from the specifications in several respects can be said strictly to comply with the specifications. The fair interpretation of this statement seems to be that, in the opinion of the testing laboratory, either the deviations from the specifications were slight and negligible or what is more likely, the provisions of the specifications deviated from were of such little importance that deviations from them might well be ignored.

On February 8, 1939, Mr. Eliot Ness, Director of Public Safety, in a letter to the Board of Control of the City of Cleveland, reported that the manual type meter of the defendant, M. H. Rhodes Inc., was the only meter which had passed the test set forth in the specifications and was the low bid, and the Director recommended its acceptance by the city. This letter was presented to the Board of Control and on February 8, 1939, the Board passed two resolutions; the first expressed the findings of the Board that "the kind of meter which is best adapted to the requirements of the City of Cleveland is the parking meter requiring manual movement in order effectually to start its operation." The second resolution accepted the bid of the defendant, M. H. Rhodes Inc., for manual parking meters.

Later, on the 13th day of April, 1939, a written contract was entered into between the City of Cleveland and defendant, M. H. Rhodes Inc., by which the latter company agreed to furnish manual parking meters to the city,

"in accordance with the attached specifications and copy of original proposal of October 27, 1938, and the supplemental letter of the said M. H. Rhodes Inc., dated February 6, 1939, all of which are attached hereto and made a part of this contract."

The letter of February 6, 1939, which was made a part of the contract, was mailed by M. H. Rhodes Inc., to Mr. C. B. Patterson, City Purchasing Agent, and stated that it confirmed the statement made orally to the city by their attorney "that if they should be awarded the contract they would make certain slight changes in the operation of the manual mark time meter selected by the city." The letter named three such changes to which we shall later refer.

The case was tried in the Common Pleas Court before Judge Silbert who

granted the injunction and gave judgment for the plaintiff.' He stated in his opinion that he found in this case "absolutely no proof of fraud and collusion." We agree with him. While undoubtedly Mr. Patterson, the Purchasing Agent of the City of Cleveland, showed interest and, after the opening of the bids, considerable zeal in having the manual meter of M. H. Rhodes Inc., accepted by the city, there is no evidence in the record to indicate that Mr. Patterson's activities were not based at all times on an honest belief that it was to the best interest of the city to rent and to purchase the manual meters submitted by M. H. Rhodes Inc., the low bidder.

While it is usually wise for a public official in considering bids for any public contract, to maintain an attitude of impartiality, like a Judge on the Bench, until the time comes to make a decision, severe criticism might well be reserved for a city official when he seeks to pass over the claims of the lowest responsible bidder in favor of a higher bid.

Considerable factual and opinion evidence is found in this record as to the relative merits of manually operated and automatic meters. This question does not call for a decision in this case. The Board of Control of the city decided in favor of manual meters and there is no evidence in the record which sustains a claim that the Board was guilty of an abuse of discretion in reaching this conclusion.

It is clear that some of the claims of illegality set forth in plaintiff's amended petition have little or no merit. Among these are the claims that the Mark-'Time meter case is not made of high corrosive-resistant material; that it is not equipped with time indicators having the required visibility; that the handle or crank is not so designed as to eliminate as far as reasonably possible any risk of catching or tearing of clothing; that the successful bidder did not submit the lowest bid; that the financial statement furnished by M. H. Rhodes Inc., was not satisfactory; that the city advertised for bids in four instead of two issues of the City Record; that the contract was not fully closed within five days after the award; that the certificate of the Director of Finance setting forth the anticipated revenue from the meters did not comply with the provisions of Section 106 and 107 of the City Charter. These were matters for the Board of Control and do not furnish sufficient basis for the claim that the Board was guilty of an abuse of discretion in this award.

There are other facts, however, in this record which must be considered. Section 50 of the Specifications provides as follows:

"SAMPLE IS PART OF BID: No proposal will be considered unless sample meters are submitted with the bid as provided in paragraph 49 next preceding * * *. The sample meters submitted by the successful bidder will be retained by the City of Cleveland until after delivery under the contract has been completed."

Section 49 of the Specifications provides:

"The City of Cleveland will test the parking meters submitted by bidders under this proposal, at an independent laboratory to be designated by the Commissioner of Purchases and Supplies of the City of Cleveland. For the purpose of this test, each bidded must submit with his proposal, and as a part thereof, three (3) parking meters of the exact kind he proposes to furnish set for a fifteen (15) minute parking interval."

The section then provides the details as to the tests to be given by the testing laboratory.

The importance of samples accompanying the bid depends on the specifications. Samples may have only a slight importance as indicating the kind of goods manufactured by the bidder and may be no part of the proposal. A case of this kind is **Many v City of Cleveland, 19 C. C. 58,** where a bid for

furnishing electric street lamps was accompanied by a sample. The lamp conformed to the specifications with the exception that the bottom of the lamp was not transparent as the specifications required. There was no provision in the specifications that the lamp to be furnished by the bidder should be "of the exact kind" the bidder proposed to furnish. The sample was not made by the specifications a part of the bid. No tests followed the opening of the bids. The court held that the sample was not a part of the proposal, and said on page 62:

"Now, whatever may have been outside of the proposals, the proposals that are made are sealed. When they are opened they show what the proposal is."

The court, therefore, concluded that "it seems to us it would be very technical to say that because the base upon which it rests is not transparent, it fails so materially to conform to the specifications as to justify an injunction to prevent its being contracted for."

On the other hand, samples accompanying the bid may be of great importance when made so by the specifications. A case of this kind is **Herrman et v Delaney, 11 C. C. 504.** In this case the specifications provided that

"each person proposing to do the work must accompany his proposal with five samples of brick **which he was to use in making such improvement.**"

The brick submitted by the low bidder failed to meet the requirements of the specifications. The Board of Administration of the City of Cincinnati then agreed with the bidder that if he would use another kind of brick which would meet the specifications he should have the contract at his bid. He agreed, and the contract was awarded to him. The court held that the Board was not warranted in awarding the contract to the low bidder. The court said:

"The statute requires competitive bidding in such cases, and the contract could legally be awarded only to the lowest bidder, whose bid is in accordance with the specifications. The express provisions in this case were, that the specimen brick furnished with the bid, must stand a certain test. In this case it is clear that those furnished by Quill did not do so. The Board then was not authorized to contract with him on his bid. To do so would be to set at naught their own express stipulations, and be manifestly unjust to other bidders, if he was allowed to substitute another and even a better, for an inferior article, and would be opposed to public policy."

In the instant case, the samples accompanying the bid are made of the most vital importance by the specifications which provide:

(1). No proposal will be considered unless sample meters accompany the bid.

(2). The sample meters must be "of the exact kind" the bidder proposes to furnish;

(3). They are expressly made a part of the bid;

(4) They are to be tested at a laboratory to be designated by the Commissioner of Purchases and Supplies.

(5) The test is to include each item of the specifications, which in addition required that the meters should "successfully meet each and every one" of fifteen named tests. It is clear that the laboratory test would be valueless unless the laboratory would be testing the article which the bidder was proposing to furnish;

(5). The sample meters were to be "retained by the City of Cleveland until after delivery under the contract had been completed."

If any bidder, after the bids were opened, had requested the city to permit it to substitute three other samples for those which accompanied the bid, would the city have been free to grant such a request?

Inasmuch as Section 50 of the Specifications begins with these words:

"Sample is part of Bid", changing the samples would be changing the bid and nothing could be clearer than the proposition that no bidder should be permitted to change his bid after the opening of the bids.

If these sample meters, in transporting them from Cleveland to Pittsburg had been damaged so as to make them unfit for testing, we would not be so technical as to suggest that other identical meters, with proper precautions, might not have been substituted. These reasonable precautions would require that the city should satisfy itself by careful comparison that the two sets of meters were in fact the same. Also the sample meters accompanying the bid should be retained by the city to comply with the specific requirements of the specifications, and to preserve the evidence if any claim should be made thereafter that the meters tested were materially different from those which accompanied the bid.

As already stated, there is no evidence that the three manual meters had been damaged in transit. On the contrary, the laboratory reported that "they seemed unaffected". Nevertheless, three manual meters were substituted for the original meters which, by the specifications, were made a part of the bid.

Were these substituted meters identical with the original meters for which they were substituted?

The City made no examination to determine this fact. Mr. Patterson testified:

"I was told that they would be the same, and that they had only the one kind of meter so that it is all I know about it."

Mr. Jones, representing the Pittsburg Testing Laboratory, testified that the laboratory made no such examination. He testified that externally the original meters and the second set of meters seemed to be the same, but that he could not say whether this was true internally, "because I did not examine them internally."

When he was asked the direct question, "whether or not the original meters and the substituted meters were the same" Mr. Jones answered: "I don't know."

Mr. Strasser representing M. H. Rhodes Inc., and who brought the substituted meters to the laboratory, when asked on the witness stand as to the identity of the two sets of meters, said that they were the same, "to the best of my knowledge." He did not testify to what extent his knowledge went, or whether he had made an examination or whether any one had made an examination for him of the two sets of meters, to determine whether they were the same.

Nevertheless, although evidence of actual damage to the original samples was lacking, the city permitted the substitution of samples. It then became the clear duty of the city to retain the original samples in order to preserve the evidence which would justify the substitution and to comply with the provisions of the specifications which required that the sample meters accompanying the bid "should be retained by the City of Cleveland until after delivery under the contract had been completed."

The original samples, however, were not retained by the city. What happened to them? Mr. Jones of the testing laboratory testified that the original sample meters were sent back by the laboratory to M. H. Rhodes Inc., on instructions given by the City of Cleveland.

Where are these original samples now? Nobody knows. Less than one week before the trial in the Common Pleas Court, some one connected with the city, probably its capable counsel in this case, became aware of the importance of the original meters. Mr. Patterson testified that within one week of the time of the trial of this case he tried to locate the original meters. He was not successful because when asked as to where the original meters are to be found, he replied, "Well, that is a sort of a moot question. Nobody seems

to be sure where they went. I don't know."

This can hardly be considered to be a satisfactory answer, in view of the fact that the original sample meters, by the specifications, were made a part of the bid of M. H. Rhodes Inc., and were to be retained by the City of Cleveland until after delivery under the contract had been completed.

Inasmuch as the original meters are lost, it is impossible to determine with complete accuracy to what extent the meters tested differed from the original meters. However, there is evidence that they did differ in at least two respects.

It was found by the laboratory, on beginning to test the manual meters of the defendant company, M. H. Rhodes Inc., that a nickle could not be inserted into the meter except by the use of another nickle or by some other instrument to force the coin into the meter. This condition existed because split rubber shields had been placed inside the coin slot of the substituted meters, which prevented the insertion of a nickle without forcing.

Mr. Jones of the laboratory testified that the rubber shields had been inserted so as to prepare the meters to withstand the weather tests. On instructions from Mr. Patterson and M. H. Rhodes Inc., the rubber shields were removed before the tests were completed.

Section 49, paragraph V, provided that "it must not be possible to stop the operation of a meter after once started, by the introduction of anything into the coin receiving device."

The handles of the sample manual meters, accompanying the bids were free revolving handles so that it was possible to place a penny in the meter after it had started to register which would reverse the mechanism. In the substituted samples, a stop had been placed on the handle so as to prevent this happening.

Section 37, paragraph IV of the specifications provided that "the meter case should have an opening that will furnish a clear view of the coin box position."

Section 37, paragraph V provided that the openings referred to in the previous sections should "be fitted with plate glass."

It is conceded that the above specifications were not complied with either in the original, or the substituted meters of M. H. Rhodes Inc.

The city considered these deviations from the specifications and the defect in the sample meters which accompanied the bid by which the insertion of a penny could reverse the mechanism of the meter after it had been started, to be of such primary importance that the city required M. H. Rhodes Inc. to write a letter to the city expressing its willingness to make the changes in its manual meters necessary to meet the specifications in these particulars and that the letter should be made a part of the contract.

Accordingly M. H. Rhodes Inc., on Feb. 8, 1939, wrote a letter to Mr. Patterson, city purchasing agent, the first two paragraphs of which are as follows:

"Confirming Mr. Parker Fulton's oral statement that we would be willing to make certain slight changes in the operation of the manual Mark Time meter, selected by the city of Cleveland, in the event you saw fit to award the contract for 3000 meters to us, we will change our tools to make an additional opening in the door of our meter in order that the coin box might be seen without the necessity of opening the door. We will also cover both openings with plate glass.

We have eliminated the criticism contained in the Cleveland Press article of December 16th, that it is possible to wipe out the legal parking time of a motorist by inserting a penny and quickly reversing the handle of our meter."

By insisting that this letter be made a part of the contract, the city admitted that the original bid of M. H. Rhodes Inc., with accompanying samples did not meet the requirements of the specifications in the particulars

mentioned in the letter of February 6, 1939, and furthermore, that these deviations were so material that their correction would be made a condition of awarding the contract to the defendant bidder. By this action the city virtually granted permission to M. H. Rhodes Inc., to change and to improve its bid and its manual meter after the bids were opened. Such action on the part of the city is contrary to the principles of law governing competitive bidding and cannot be upheld.

In Herrman v State, 11 C. C. 504, already referred to, the court said on page 506:

"It is not within the power of the board in our judgment to make an agreement with such person that he will put in other materials than those he had bid for, even if they were of better and costlier material than that bid to be furnished by him. The reason for this is that the contract so made is not awarded on the one bid of the person—the contract would be partly on his original bid and partly on a new contract made between him and the board and such procedure might be liable to very gross abuse."

Scheff v Wiegand, Mayor, 37 Oh Ap 177, paragraph 3 of the syllabus reads:

"Bid for incinerator plant not conforming to specifications, orally modified to conform to specifications, held, 'not competitive bid' and construction thereunder could be enjoined."

In this case, the opinion was by Vickery, J. He said on page 179:

"The difficulty arises in that the bid of the successful bidder was not accepted in the terms that it was made, but verbal agreements were subsequently added to it by the successful bidder.

We are pointed to a statute, §4331, GC, which provides that, after a contract is let, if it becomes necessary to make changes, such changes may be made in the contract; and deductions or additions, insofar as compensation is concerned, may be allowed. The trouble with that argument is that here was a written bid by the successful bidder which did not conform to the specifications, and subsequently a verbal modification of the bid gave the successful bidder an opportunity which the others did not have. In other words, it was not a competitive bid, because the bid as submitted was not accepted, nor was it acceptable, nor did it conform to the specifications, and the fact that the successful bidder afterwards agreed to make certain modifications and changes in order to conform to the specifications would constitute a radical departure from the bid; and, while in this case there might be no harm done, it would be a dangerous precedent to establish because it might open the door wide to fraud and connivance between the bidder and the authorities which the statute meant to prohibit."

So far we have been dealing with deviations from the specifications in the defendant's Mark Time Manual meter, which either have been corrected or which the defendant has agreed to correct in the meters to be furnished the city. In addition, it is plaintiff's claim that the M. H. Rhodes Inc., manual meter, after all promised changes have been made, will continue to fail to comply with the specifications in material respects, and we find that some of these claims of the plaintiff are well founded.

Section 49, paragraph V of the specifications provided that "it must not be possible to stop the operation of a meter after once started by the introduction of anything into the coin receiving device."

It is in evidence that it is possible to insert a nickle in the coin receiving device of the Mark Time manual meter so as to make the meter stop at dead center. Mr. Jones of the Pittsburg Testing Laboratory testified that this constitutes a violation of Sec. 49, paragraph V, of the specifications.

Section 37, paragraph XI-(a), of the specifications provided that "the timing device shall be so designed as to be easily and positively set for each of the following intervals: Ten (10), Fifteen (15), Twenty (20), Thirty (30), Forty-five (45) and Sixty (60) minutes and shall be so set in the meter case that it may be readily removed therefrom without necessity for moving or removing any other mechanism or any other device contained within the meter case."

Plaintiff claims that the timing device of the Mark Time Manual Meter is a sixty (60) minute timer and cannot be changed to any other period.

The laboratory reported that such an adjustment is possible; however, when Mr. Jones of the Laboratory was asked on the witness stand to change the timing device of defendant's manual meter from a sixty (60) minute to a fifteen (15) minute interval, he replied: "This is going to be tough." He also said that he might have to try the the adjustment three or four times before getting it right.

The second low bid on the automatic meters was for furnishing a Dual automatic meter which is an exhibit in the case and we have examnied it. The outside cover is fastened with a lock which can be opened with a key thus disclosing the inner mechanism of the meter. The time adjustment in this meter is made by changing the position of a screw which is a simple operation and can be easily seen and understood. No such method is provided for viewing the internal mechanism of the Mark Time manual meter.

We think it clear that the timing device of the Mark Time manual meter cannot be "easily" set for the time intervals mentioned in the specifications and only with difficulty and after repeated trials, if at all, can it be "positively" set for the same intervals.

It also appears from the record that it is not possible to remove the timing device in the Mark Time manual meter without at the same time removing some of the other mechanisms of the meter, contrary to the requirements of

Section 37, paragraph XI-(a) of the specifications above given.

Section 49, paragraph II of the specifications required that a bidder submitting a sample for test purposes, in order to expedite certain tests would be "required to provide for setting each sample meter for operation on a two (2) minute interval" and that "the setting of the meter at this interval will in no case be undertaken either by the City of Cleveland or by the testing laboratory.

The plaintiff claims that the Mark Time manual meter cannot be set for a two (2) minute interval required by the specifications but that it was necessary to install a separate timer in the meter for this purpose. The city contends that this applies only to the Mark Time automatic meter. Some support for plaintiff's claim is found in the laboratory report where it is stated:

"That no particular effort was made to set the meters to exactly two (2) minutes"

as the specifications require.

After the Mark Time automatic meter had failed, tests were made by the Pittsburg Testing Laboratory of the Dual automatic meter. The representatives of this meter make the claim that their meter was discriminated against at the Laboratory and was subjected to tests other than those provided for in the specifications and different from those to which the Mark Time meter had been subjected.

We have not gone carefully into these claims because the Mark Time meter must stand or fall on its own merits. However, such claims may have some bearing on the question of the fairness and impartiality of the laboratory tests.

In the case of the Mark Time manual meter, the laboratory attempted the setting of the meter for a two minute (2) interval. In view of the provision in the specifications that such a setting of the meter would "in no case be undertaken either by the city or by the testing laboratory" the laboratory was careful to secure the written permis-

sion of the manufacturer of the Mark Time meters for the laboratory to make the two (2) minute test setting. This fact is stated on page 14 of the laboratory report of the test of the Mark Time manual meter.

It is interesting to note the procedure that was followed in the case of the testing of the Dual automatic meter in this particular.

Mr. Tompkins, representing the Dual Automatic Meter testified that he waited one week in Cleveland expecting to be notified to go to Pittsburg to the laboratory to set the Dual automatic meter for the two minute interval. He was never so notified and the laboratory made the adjustment without securing the written or the oral consent of the Dual Automatic Meter Company like the one obtained from the manufacturers of Mark Time Manual Meter.

Mr. Jones of the laboratory testified that he made this adjustment without getting the consent of the Dual automatic meter representative because he had a letter from Mr. Patterson, City Purchasing Agent, authorizing it. The Dual Automatic Meter Company claims that the adjustment was not properly made by the laboratory and that this fact had serious results in the tests. Clearly the Dual Automatic Meter Company was entitled to notice in this matter by the plain provisions of the specifications and it was not given.

It is unfortunate that evidence such at this affords some basis for the suspicion that the tests as between rival bidders were not as fair and as impartial as they might have been. It is quite evident that both the city and the laboratory might have taken greater care to make certain that no claims of favoritism and unfairness could ever be justly raised in this case.

There is one mandatory provision in the specification which the defendant, M. H. Rhodes Inc., admits it has not complied with in any sample, and which is concedes it will be unable to meet.

Section 37, paragraph XI-(d) of the specifications provides:

"The coin receiving and coin actuating device shall be so designed that it will operate by the insertion of a United States five (5c) cent piece but not by a coin of smaller value, and every reasonable effort must be made in such design to provide for rejecting of tokens, slugs and similar objects, and further, to eliminate obstruction of the device by the insertion of such objects. Further, this device must be so designed as to be easily accessible and easily cleaned of foreign matter, notwithstanding that the design must be such that the last coin inserted cannot be removed by way of the coin box compartment except by insertion of another coin in the coin receiving device and a coin inserted in the meter shall not be retrievable from the outside of the meter case, by the use of any ordinary hand tool."

M. H. Rhodes Inc., admits that the requirement in the above section of the specifications "that the last coin inserted cannot be removed by way of the coin box compartment except by insertion of another coin in the coin receiving device" is not, and can not be complied with in the Mark Time manual meter. The fact is that any child would have no difficulty in removing the last nickle from the coin box in this meter when the coin box compartment is exposed.

The city seeks to minimize the importance of the failure of the defendant bidder to meet the above requirements of the specifications in two ways. (1) The city claims that all the samples submitted by other companies had the same defect; (2), it is the city's contention that the purpose of this requirement is to make it impossible for the city's cash box collector to appropriate to himself the nickle piece in the slot when he removes the box from the meter. The last nickle deposited in a meter remains in the slot in full view until another nickle is deposited; at which time it is automatically deposited in the coin box. It is obvious that if the collector can slip the nickle out of the slot he can, if dishonest,

steal one nickle from each meter each time he takes out the coin box for delivery to the city treasurer. With 3000 meters in use it is possible for dishonest collectors to steal $150.00 per day in this manner.

The city suggests that it will be able to meet this difficulty by requiring each coin box collector to remove the last nickle from each meter in making his collections so that with each coin box delivered to the proper city official, the collector will also be required to produce a nickle piece.

It is probably true, that the last nickle can be removed from the coin box in every meter submitted to the city. However, it is very much easier to remove the nickle from some of the meters than from others. The only meter other than the Mark Time meter that is an exhibit in this case is the Dual Automatic Meter and an examination of this meter shows that it is difficult, if not impossible, to remove the last nickle by hand although it probably can be removed by the use of an instrument or tool.

Even if it were true that this defect is found in all of the meters submitted to the city, it is hard to see how this fact can help the defendants in this case.

Mr. Johnson, the City Traffic Engineer, testified that the specifications in this case were prepared with the greatest care. The city secured a half dozen or more specifications from different cities in the country where parking meters had been installed. According to Mr. Johnson the specifications were prepared by "deleting those particular parts of the sample specifications which were not of any advantage and inserting additional requirements which would give us a suitable meter for the City of Cleveland."

The city now claims that the above requirement of the specifications is beyond the ability of any manufacturer to meet and for this reason is asking the court to delete this requirement from the specifications. No explanation is offered by the city for the insertion in specifications prepared with such care, of a mandatory provision which the entire parking meter industry is unable to meet. If this requirement is of such a character, the specifications must be rewritten by the city and it cannot ask this court to rewrite the specifications for it. If a rival unsuccessful bidder were the plaintiff in this case and alleged this defect in the Mark Time manual meter, it might well be held that the fact that plaintiff's meter had the same defect would preclude such a plaintiff from taking any advantage of this particular defect. Such a consideration, however, does not apply to a suit by a taxpayer.

It is likewise difficult to assign any merit to the claim of the city that the above requirement of the specifications has ceased to have any importance by reason of the fact that the city has discovered another method of accomplishing the result aimed at by this requirement. If such a claim were admitted, it would be very difficult if not impossible to set any limit to the right of the city to ignore or to delete specifications which it might discover even after the opening of the bids, to be of little importance. Such a possibility would open wide the door to favoritism. A natural result of writing into the specifications mandatory requirements so rigid that no bidder is able to meet them is either to deter bidding or to cause bidders to raise their bids so as to protect themselves from losses if awarded the contract, caused by their inability to meet the specifications. Either result should be avoided.

An examination of the specifications in this case shows that they contain both "may" and "must" clauses, sometimes in the same paragraph. In the paragraphs now under consideration, Sections 37, paragraph XI-(d), it is provided that,

"every reasonable effort must be made in such design to provide for the rejection of tokens, slugs and similar objects."

The requirement to use "every reasonable effort" is a "may" provision. On the other hand, in the same section it is provided that "this device must be so designed" as to make impossible the abstraction of the last nickle from the coin box. This is a "must" requirement. The court is not asked here to change a "must". clause to a "may" clause, but to ignore or delete 'it althogether.

We recognize that there is wide room for the exercise of a reasonable discretion by an awarding body such as the Board of Control in cases of this kind. The following affords a good illustration of the reasonable exercise of such a discretion.

Section 37, paragraph XI required that the mechanism should have "a parking time indicating device and a device to indicate that the meter is not in operation."

Section 37, paragraph XI-(b) required that at the termination of each parking time interval such termination is to be shown "by a further indicator or other means which will indicate illegal or overtime parking."

Defendant's Mark Time meter does not have a secondary device to indicate that the meter is not in operation. Such a condition, however, is shown in another way. One-half of the dial is white and one-half is red; when in operation, the hand is on the white, and when not in operation the hand is on the red portion of the dial. Likewise, the position of the pointer in the red or white zones indicates illegal or overtime parking.

One of the allegations of plaintiff's petition refers to this last deviation. It is our opinion that this deviation is only technical and that ▮▮▮▮▮▮▮ the Board of Control in the exercise of a reasonable discretion could well hold that the Mark Time manual meter substantially complies with this requirement of the specifications.

It is not necessary to differentiate such a case from those provisions of the specifications where there is no pretense that they are complied with.

In the report that the Pittsburg Testing Laboratory rendered to the City of Cleveland on the tests of the Dual Automatic Parking Meter, the laboratory set out in detail the particulars in which the meter did not meet the tests. This was not done in the report which the testing laboratory furnished on the tests of the Mark Time meter.

When Mr. Jones was asked on the witness stand for an explanation of this difference in the two reports and why the report of the Mark Time meter did not set out in detail wherein the meter did not meet the tests, he replied that "it wasn't convenient" to do so. Later he said that it was not convenient because there were more deviations in the Mark Time meter than there were in the case of the Dual Automatic Parking Meter.

It is true that Mr. Jones referred to these as "minor deviations". He did not indicate what standard he applied in differentiating "minor" from "material" deviations of mandatory provisions in the specifications. There is nothing in the record to indicate that the testing laboratory had had any such experience with the manufacture or operation of parking meters as to give the opinion of the laboratory as to what were "minor" and what were "major" or "material" deviations from the specifications any weight. The specifications themselves furnished the best answer to this inquiry. When the specifications provide as they do in this case, that the sample meters must meet "each and every one" of the named tests and that the laboratory test "shall include each item of these specifications to determine whether the meters submitted are in conformity herewith" no laboratory and no court would be justified in holding that a substantial failure to meet any of the named tests or a material deviation from any of the "must" requirements of the specifications would be a "minor" failure or deviation.

In cases of this kind the law requires that the bid must be responsive to the proposal in all material respects. The

question to be determined is,—is there substantial conformity or a material variance from the specifications?

In Andrews v Detroit, 233 Michigan 79, the Supreme Court of Michigan said:

"There can be no question that the bid must conform to the specifications and the contract to both."

In Southern Surety Co. v Prescott, 221 Pacific 834, the Superintendent of Streets agreed, for a consideration, to eliminate from the contract a clause in the specifications designed to secure protection against frost. The court held that such an agreement made the contract illegal. The court said:

"The inherent vice of the whole transaction both legal and moral, under which this claim is being made, appears from analysis. If the safeguard against danger from frost was not necessary for the good of the work to be done it should not have been incorporated in the specifications. If it was necessary, it was wrong to stipulate with the contractor that it might be left out."

In Desmond v City of Mankato, 89 Minnesota 48, syllabus 1, reads:

"Any contract entered into with the best bidder containing substantial provisions beneficial to him which were not included in the specifications is void for it is not the contract offered to the lowest bidder by the advertisement."

The court said, on page 451:

"This rule should be strictly enforced by the courts, for if the lowest bidder may, by an arrangement with the municipal authorities, have incorporated into his form of contract new provisions beneficial to him or have onerous ones excluded therefrom which were in the specifications upon which the bids were invited, it would emasculate the whole system of competitive bidding."

In Case v Trenton, 76 N. J. Law, page 696, syllabus 1:

"Where a statute requires competitive bidding in awarding contract for public work, each bidder should be compelled to conform to any substantial condition imposed upon other bidders in presenting his proposals so that all bidders should be put on the same footing."

The court said on page 700:

"This is the policy which prevents the modification of specifications after bids have been presented and the awarding of the contract to one of the bidders based upon such revised specifications."

It may well be true that the proposed contract between the City of Cleveland and M. H. Rhodes Inc., would be a good contract for the city. That is not the question we are called upon to decide. Without doubt, in cases where the administration of the city's affairs is both honest and efficient, the city would often be better served by giving the various city departments the same leeway and discretion in making purchases as is enjoyed by the purchasing departments of many large private corporations. The law, however, by its very nature, must be general in its operation and it does not give to one city administration privileges and discretion not granted to all.

The majority of this court believe the conclusion inescapable that the proposed contract between the defendants in this case, for the reasons already stated, violates the requirements of well established law as to competitive bidding and that therefore judgment must be entered for the plaintiff.

Judgment for plaintiff-appellee. Exceptions.

TERRELL, PJ., concurs.
LIEGHLEY, J., dissents.

14

LIEGHLEY, J. (Dissenting):

This case is here on appeal on questions of law and fact from an order of the common pleas court granting a permanent injunction restraining the City and certain officers from proceeding with a contract theretofore entered into with M. H. Rhodes Inc., for the installation of three thousand Mark Time Parking Meters. Trial was had on the original petition in the Common Pleas Court in which a large number of reasons were pledged to sustain the alleged illegality of this contract. The trial court found that the charges of collusion and fraud, etc., were not sustained by proper and sufficient proof but did find that the particular parking meters contracted for failed in many respects to meet the requirements of the specifications. In this Court an amended petition was filed with leave, making M. H. Rhodes Inc., a new party defendant, for the reason that some time prior to the contract, in pursuance of the award, had been duly executed.

It appears that several years ago the City of Cleveland, confronted with the serious and ever increasing traffic problems, decided to make a complete survey thereof. To this end a specialist, Vurnon Johnson, was employed as Traffic Engineer. Doubtless a complete and exhaustive checking of traffic at that time was made. The subject of the installation of parking meters was considered and also thoroughly examined. In so doing, questionnaires were mailed to many cities throughout the country to ascertain the kind and character of meters in use in the respective cities and the kind of specifications employed in determining the kind and character of parking meters eventually adopted by the various cities. Some four-score municipalities were found to be using to a greater or less extent parking meters for the regulation and control of traffic.

After exhaustive study of the local problems and the information obtained by and from the replies to these questionnaires, the city determined to proceed and experiment with about three thousand (3000) meters. In the meantime, the ordinances and laws of the city were amended and supplemented to provide authorization for so doing.

Also, in the meantime, the task was presented of preparing specifications for a proper workable parking meter with necessary restrictions and safeguards to guarantee efficient service. The various specifications in the hands of the officers of the city in charge of the traffic problems that were received as a result of the questionnaire were carefully examined and many suggestions of parking meter manufacturers and others were considered and it is to be presumed that from all sources those suggestions deemed the best were selected and went to make up the specifications adopted by the city.

After these specifications were prepared and on file, advertisement for bidders for three thousand (3000) parking meters was duly published for four consecutive weeks beginning September 28, 1938, with the date for opening bids set for October 27, 1938. On October 8th and October 13th, 1938, while the notice was in process of publication, two minor changes were made in the specifications of which due notice was promptly given to all prospective bidders.

The bids were opened on October 27, 1938, and M. H. Rhodes Inc., was found to have bid the lowest price, on both manual and automatic parking meters. It was a condition of the bidding that each manufacturer submitting a bid should accompany the same with three samples of the parking meter for which the bid was submitted. Three samples of manual and three samples of automatic meters were submitted by M. H. Rhodes Inc. It was also a condition of the bid that these samples were to be sent out for laboratory test and the six samples submitted by defendant, M. H. Rhodes Inc., were shipped to the Pittsburg Testing Laboratory. This concern eventually reported that the samples of M. H. Rhodes Inc., came nearest to complying with the requirements of the specifications but called attention to only three substantial de-

viations. It was reported that the sample did not have a window through which the coin box could be observed. Also, that the two windows were not covered with plate glass as specified, and third, that the nickle last placed in the meter could be readily extracted by the use of common tools. The samples of Mark Time Automatic Meters furnished by M. H. Rhodes Inc., were reported by the laboratory as not meeting the specifications. Thereupon, the automatic meters furnished by the bidder, Dual Parking Meter Company next lowest bidder, were dispatched to the laboratory for testing, upon which and in regard to which the laboratory subsequently reported.

The proper officers of the city had the burden of selecting either a manual or automatic meter for use. This matter was under consideration for some time. Eventually, Director Ness recommended the selection of the Mark Time Meter. Patterson, Commissioner of Purchases and Supplies, preferred this same meter. The Traffic Engineer selected this meter as most practical. The laboratory recommended this meter.

On February 6, 1939, a meeting was held by the Board of Control of the city, Directors Ness, Gesell, Brainard and Commissioner Patterson with representatives of M. H. Rhodes Inc., being present, at which counsel for Rhodes Inc., advised the officers of the city that the matter of another window and plate glass would be duly corrected by M. H. Rhodes Inc. The city, at that time, insisted that such agreement should be in writing, and a part of the contract. A long distance call was made to the M. H. Rhodes Inc. and a letter received promptly setting forth such agreement to place another window in the meter to enable observance of the coin box and to cover both windows of the meter with plate glass. The award was then duly made to M. H. Rhodes Inc., on February 8th, 1939.

The evidence discloses that this was not done on the samples, for the reason that it would require a change of dies and methods of manufacture and the bidder did not wish to do this unless and until he was found to be the lowest responsible bidder and award of the contract had been made.

In respect to the extraction of the coin, it was found that this deviation was present on the samples of all the bidders and the city decided to avoid any possibility of theft by the coin collector by a requirement that the last nickle in each meter should be collected with and at the same time as the coin boxes were collected.

The plaintiff strenuously asserts that the defendant, M. H. Rhodes Inc., was not in fact and in law a bidder, for the reason that the samples furnished did not meet specifications in at least the three above stated respects.

It is safe to say that no sample supplied by any bidder completely and entirely met the terms of the specifications. Each and all of them would require some alteration in the event such bidder was determined to be the lowest responsible bidder and received the award. The samples of all provided and supplied the general construction and mechanism of the meter manufactured by each bidder or intended to be supplied by each. It is a reasonable conclusion to say that it was the understanding of each and all that the bids were submitted and the samples provided with the understanding that such minor details would be changed if and when such bidder was determined to be entitled to the award and contract, as each bidder could readily observe the deviation in the samples supplied by the other.

Many reasons are assigned by plaintiff why this award should be set aside and the contract cancelled.

With one possible exception, it is the opinion of the writer that there is no point and very little substance to any of them. A few illustrations follow.

It is claimed as a reason that the contract was not signed within five (5) days of the award. At the time the award was made there was pending in the courts a law suit in prosecution by the same interests that are now prosecuting this law suit. It was claimed that the city had no right to rent and

install parking meters. This contention was not sustained by this court by the judgment of March 10, 1939. As stated, the award was made on February 8, 1939. Execution of the contract was delayed until the expiration of the twenty (20) days within which a motion to certify might be filed. This was not done and preparation of the contract began immediately thereafter. However, this law suit was instituted on or about March 31, 1939. The contract was executed, nevertheless, on April 13, 1939, after which leave was obtained and granted to file an amended petition in this action in this court. The pendency of this and the former litigation was said to have caused the delay in the execution of the contract. In what manner the delay in its execution coud ·prejudice the rights of anyone, unless it be one of the contracting parties, is difficult to decide. Certainly the public was not prejudiced nor was either of the unsuccessful bidders. The only interested parties that could be in any way prejudiced would be the contracting parties, neither of whom is complaining.

. Again, it is urged that the advertisement for bids was for a period of thirty (30) days instead of two weeks, and that this is a sound basis for nullifying the contract. A publication of two (2) weeks at least is mandatory, but it does not appear that anywhere is there any requirement that the publication shall be limited to two weeks. Who could be prejudiced by having notice for thirty (30) days instead of two (2) weeks. All the bidders were fully advised and exercised their election to bid under the terms of the publication of notice. Having done so, it does not seem proper or logical that either should be permitted now to invalidate a contract for this reason, a contract which each failed .to get by reason of the character and amount of their bids.

Again complaint is made that the meeting of the Board of Control on February 6, 1939, where representatives of M. H. Rhodes Inc., were present, was a secret meeting held to the ·prejudice. of the other bidders. When it was fin-

ally determined by the proper officers in the exercise of what appears to be their sound discretion that this bidder should receive the award, what right existed in any other bidder to be notified of any such meeting at which it was proposed to fix the terms of the contract to the one to whom it was intended to make the award. It is just such a meeting as would be expected to be held for either of the other bidders that might have received the award. The successful bidder was under no obligation to notify the other unsuccessful bidders of the meeting with the officers of the city. And the city having determined upon the successful bidder, owed no duty to advise other bidders to attend the meeting at which the matter of the award to the successful bidder was under discussion. Such a procedure has never been adopted by any municipality so far as has come to our attention.

Again, it is claimed that there was a substitution of samples forwarded to the testing laboratory. The proof discloses that the original samples were damaged in transit. The testimony is that out of the same stock at the factory exactly the same kind of samples were sent to the laboratory or taken there and that like samples were in fact tested by the laboratory and a report made by it in respect to these.

If there is any substance to such claim, then a railroad wreck and total destruction of the original samples would have the effect of nullifying the bid and eliminating such bidder from competition.

The one possible exception referred to above is this. Three alleged deviations from the specifications in the samples furnished were emphasized at the hearing. It was claimed that the sample meters did not have an opening or window to observe the coin box in place; that the openings or windows were not enclosed with plate glass, and that the meters were not so constructed as to prevent the easy extraction of the last nickle inserted into the slot.

In respect to the first two, the meters were present with the bids and

the absence of these requisites obvious to all, or at least were available for observation and inspection. The proof is that they were, and the samples submitted in this form with the understanding that the bidder would change the dies to meet these specifications. All could see these variations and all must have understood that the bids were made and samples submitted by M. H. Rhodes Inc., as well as others with changes contemplated in the event this bidder was finally awarded the contract. This bidder did receive the award and the contract requires a meter thus equipped to meet these specifications.

In what manner is this taxpayer or the public or any other bidder prejudiced by a requirement in the contract that the meters delivered shall comply in these respects?

Complaint might be justified if the executed contract did not so provide. In view of the happenings at the meeting of February 6, 1939, it is quite certain the award would not have been made without this written agreement to comply.

In respect to the third, no bidder submitted a sample meter that completely guarded the last nickle from extraction by a thief with the use of ordinary tools. This was a requisite designed to safeguard the city from loss of the last nickle inserted into each meter in operation, and remove the temptation from any collector to become a petty thief.

Since none had successfully safeguarded this potential irregularity, and the manual meter of M. H. Rhodes Inc., being otherwise satisfactory, the proper officers of the city having this matter in charge, decided that this end would be accomplished by a rule or requirement that the collector deliver to the City Treasurer the last nickle deposited with each sealed coin box from each meter.

Since no other bidder fully complied in this regard, how was this taxpayer, the public, or any other bidder prejudiced? The officers of the city were seeking a workable and efficient meter. They had the benefit of an exhaustive survey of meters in other cities. They had an opportunity to examine and compare the sample meters submitted by the bidders for this award. They were pioneering in the Cleveland field. They decided this method furnished a practical solution of the problem with equivalent financial protection.

Is a non-complying bidder deprived of fair and competitive bidding by such a conclusion on their part, as claimed by this taxpayer plaintiff?

This taxpayer is asserting claims on the ground of unfair and non-competitive bidding based on the manner of the letting of this contract. It is said that there was concealment to favor and prefer M. H. Rhodes Inc. Yet the notice to bidders was published for thirty (30) days. The specifications were on file. All prospective bidders were duly notified of the not unexpected additions thereto of October 8th and October 13th. The bids of each and all were opened at noon October 27, 1938, probably with each bidder present or represented, when it was discovered that M. H. Rhodes Inc., was low on both manual and automatic meters. It was known by the published notice that the samples of the low bidder should be sent to a laboratory to measure compliance as a condition of the invitation to bidders. This was done, and after due time the laboratory reported failure of the Mark Time Automatic Meter of M. H. Rhodes Inc., and that the manual meter of Mark Time met requirements. Thereupon, as required by the notice to bidders, the automatic meter of the Dual Parking Meter Company, next lowest bidder, was sent to the laboratory and it failed to meet the tests. Under the terms of the offer, this furnished justification for the proper officers of the city, coupled with other data in their possession, for selecting the Mark Time manual meter upon the recommendation of the laboratory.

But, it is said this result was produced by the antecedent activities of Patterson, Commissioner of Purchases and Supplies. The Board of Control, by ordinance, was charged with the

duty of selecting the type of meter and making the award. Abundant and compelling proof would be required to convince that the action of the Board of Control, made up for the most part by the Directors of the City departments of government, was the sole and exclusive judgment of one of its subordinates.

All bidders knew that the laboratory check would play an important part in deciding the successful bidder. It was an express proviso of the notice and invitation to bid. When the result of these tests was reported and the Mark Time manual recommended by the laboratory, by what right was any other bidder entitled to notice of further steps taken in the process of executing a formal contract?

All bidders received due notice of all activities and matters of which they were entitled to know, up to the time the award was determined. The claim of unfair and non-competitive bidding cannot be predicated upon happenings thereafter attendant upon the insistance of the city that the contract express all the terms of the award made.

There is claim of collusion with little evidence to support it unless almost unanimous favor and preference for the Mark Time manual meter be synonymous with collusion.

Collusion necessarily implies cooperation of the participating parties, but cooperation and unanimity of preference does not necessarily spell collusion. The letter of Patterson to Director Gesell speaks favor and preference for this meter with reasons defined. The letter read to the Board of Control by Director Ness, who is in direct charge of and responsible for the department of traffic control, expresses a clear preference for the meter selected and gives reasons therefor which seem amply sufficient to him.

The Board of Control, in making the award in favor of this meter, thereby loudly proclaimed its preference. But, in the absence of proof of fraud or bribery or corruption, it is not collusion, but the expression of a judgment of the merits of this meter for the price

agreed to be paid and the efficiency possessed by it, concurred in by all. No malfeasance may be imputed to these officers or either of them, from the fact of agreement on one type of meter alone.

It should be noted and stressed that this is not a case of bidding on a contract for brick or stone or building material. It is not a case like some of the authorities cited of furnishing samples of a kind and quality of brick or stone or material different than specified that go to the quality and durability of a proposed private or public improvement. This case relates to a mechanical device, and involves an inventor's or engineer's problem in respect to safeguarding the much exalted nickle. It is a mechanical device that is sought at lowest cost, that is designed and constructed to serve as an efficient aid in the regulation and control of traffic that was the ultimate aim of the original survey and subsequent activities and proceedings had and taken by the officers of the city charged with the responsibility.

This action takes the form of a taxpayer's suit. It is claimed that the award made to M. H. Rhodes Inc., is illegal; that the contract executed is illegal, and should be cancelled; that the proceedings eventuating in the award and contract were irregular and not in conformity to law; that unless the award is vacated and the contract cancelled there is involved an illegal expenditure of public money.

It is claimed that the Mark Time manual meter falls far short of meeting the specifications but that the automatic meter of the Dual Parking Meter Company completely and strictly meets each and every requirement thereof. The Dual Parking Meter Company is not visibly asserting any such claim, and so far as brought to our attention is not doing so elsewhere.

The officers of the city deny that the Dual Automatic Meter complies. The officers claim that the Mark Time manual meter does comply. The city also claims that all proceedings had, ante-

cedent to making the award and letting of the contract, are legal.

Notwithstanding the claims of plaintiff taxpayer, in respect to the Mark Time manual meter, the Pittsburg Testing Laboratory reported that this meter filled the requirements. Vurnon Johnson, special traffic engineer for the city, selected and approved this meter. Director Eliot Ness, head of the Safety Department of the city approved the meter. Patterson, Commissioner of Purchases and Supplies, prefers this meter. The Board of Control possessed of the examinations, surveys and information gathered by the officers and employees of the city, in making an exhaustive survey, determined and decided that this Mark Time manual meter met the requirements of the specifications to the extent intended and as provided.

In view of all these facts, and in view of the matters set forth in the foregoing opinion, and in view of the almost unanimous conclusion of all the officers and employees of the city concerned with this matter, is this situation such as the courts would be justified in intervening? It is not the province of the Courts to direct and control the administration of the government. In face of the proof on the part of the city and its interest, should this court undertake to vacate this award and cancel this contract upon the claims made and proof offered by the plaintiff? The city, through its officers and employees, have established with substantial proof that the proceedings had leading up to the award were all in substantial compliance with the statutes and ordinances and that the meter selected with reference to which the award was made and contract let, meets all requirements in all respects with the exception of the matter of safeguarding the nickle which was adjusted in the manner hereinbefore stated.

It is my conclusion that the plaintiff has failed to establish safe and sound ground for invoking the equitable jurisdiction of this Court to the extent of granting the prayer of her petition.

In the absence of rather clear proof of either fraud, bribery or corruption on the part of any city official, this court should not stamp the conduct of the officers of the city or either of them with non-feasance or malfeasance in office upon the unconvincing evidence offered to sustain the claims of the plaintiff nor should this court interfere with this administrative function of the city in its endeavor to regulate and control traffic by the best mechanical aids obtainable. It will require actual trial of this meter on the streets to demonstrate that the city through its officers exercised inferior judgment and discretion in their discharge of an administrative function of traffic regulation and control. Under all the circumstances, courts should not intervene.

It is my oipnion that the petition should be dismissed with judgment for costs against the plaintiff.